IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| MARY J. KIEFER, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 06-3470-CV-S-ODS ) |
| MICHAEL J. ASTRUE,[1] Commissioner of Social Security, | ) ) ) |
| Defendant. | ) ) |

ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING DISABILITY INSURANCE BENEFITS

Pending is Plaintiff's request for review of the Commissioner's final decision denying her application for benefits under Title II and Title XVI of the Social Security Act. For the following reasons, the Commissioner's decision is affirmed.

I. BACKGROUND

Plaintiff was born in July 1971, has a tenth grade education, and has not obtained her GED. She has prior work experience as a factory worker, stocker, restaurant worker, and nurse's assistant. She alleges she became disabled on July 15, 2003, due primarily to the continuing effects of having undergone implantation of a pacemaker. Plaintiff suffered from congenital heart defects that necessitated surgery to repair a valve in December 1999 and the pacemaker was inserted in January 2000. The surgery was performed by Dr. Stanley Wiggins, a cardiovascular specialist and

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security and should, therefore, be substituted as the Defendant in this case. Fed. R. Civ. P. 25(d)(1).

cardiac surgeon. Dr. Wiggins has continued to monitor Plaintiff's condition.[2] In addition, Plaintiff is seen by her regular physician, Dr. Randall Qualls.

In January 2002, Plaintiff told Dr. Wiggins she had "been out trying to get a job, but nobody wants to insure her because she has a pacemaker and in and is post heart surgery." Therefore, she spent most of her time watching television. Dr. Wiggins "encouraged the patient to become more physically active in terms of walking, and not watching television all day." His report of that date did not impose any restrictions on Plaintiff's activity. R. at 236. On June 4, 2003, Plaintiff told Dr. Wiggins she was experiencing some chest pain the previous week, but also reported she had been breathing normally and riding a bike up to five blocks. R. at 359. On January 26, 2005, Plaintiff told Dr. Wiggins she was felt "a little pain yesterday." While he examined Plaintiff and wrote a treatment plan, it is difficult to determine what he wrote. R. at 357-58. On or about February 8, 2005, Plaintiff called Dr. Wiggins' office and reported "[s]he had been playing on video games and . . . she developed a sharp pain . . . through her chest to her left shoulder." She experienced unusual sensations throughout the night. Dr. Wiggins thought the incident did not indicate a major issue because she was at "baseline." R. at 356. None of Dr. Wiggins' reports impose any restrictions on Plaintiff's activity, and all reports indicate she was recovering well from the surgeries and the pacemaker was working well.

Many of the records from Dr. Qualls either address matters unrelated to Plaintiff's claim of disability or address Plaintiff's condition before the alleged onset date (and, in some instances, before her surgery). On November 22, 2002, Plaintiff admitted to fatigue and tiredness, but denied experiencing shortness of breath or chest pain on exertion. R. at 191. On December 5, 2003, Plaintiff told Dr. Qualls she had gone for a walk and after three blocks experienced shortness of breath, but denied any chest pain. Dr. Qualls prescribed an inhaler and "strongly encouraged weight loss and exercise." R. at 334. Plaintiff saw Dr. Qualls on May 6, 2004, and also did not complain of chest

---

[2]On some occasions the monitoring consisted of taking readings electronically over the phone and did not involve an office visit.

2

pain. R. at 345-46. On May 15, 2004, Dr. Qualls completed a Cardiac Residual Functional Capacity Questionnaire ("Cardiac RFC"). He indicated Plaintiff suffered from chest pain, shortness of breath, edema and fatigue. However, he indicated Plaintiff does not have a marked limitation in her physical activities, her cardiac condition would seldom be severe enough to interfere with her attention and concentration, and she is capable of performing low stress jobs. He opined Plaintiff could walk for three blocks without rest, sit for two hours at a time, stand for forty-five minutes at a time, lift between ten and twenty pounds occasionally and less than ten pounds frequently. R. at 349-54.

Plaintiff complained of chest pain on July 19, 2004, and an echocardiogram was ordered. R. at 343-44. The echocardiogram was performed two days later and showed no abnormalities beyond the evidence of the past surgery and the pacemaker's presence. R. at 339-42.

In May 2004, Dr. Qualls began prescribing Lexapro for depression. R. at 345. The dosage was ten milligrams daily, and the Cardiac RFC indicate there are no side effects from this medication. R. at 351. The amount of medication prescribed was never altered.

Plaintiff testified that she lives with her fourteen year old daughter and the father of her daughter. R. at 33-34. She testified she experiences back pain that radiates up her spine. She treats this pain with Tylenol, which provides relief some of the time. R. at 36-37. She suffers from depression, "real bad mood swings," and irritability, which is the reason Dr. Qualls prescribed the Lexapro. R. at 38-39. She does not see a therapist. R. at 39. She regularly experiences pain in the area where the pacemaker was installed, and reported this pain to Dr. Wiggins in January 2005 but he "really didn't say what to do. He just said kind of take it easy and try to rest with the pain. If it gets too bad to call him." R. at 39-40. Sometimes, these incidents last for three to four days, during which time she is unable to do anything. R. at 41. She experiences unexpected bouts of aches and numbness in her left arm that is usually accompanied by shortness of breath that also renders her incapable of "doing anything." R. at 41-42. She has bouts of fatigue daily during which she "can't do much of anything;" these bouts last between two to three hours and half a day. R. at 43. The Lexapro helps with her

3

depression, but she still has mood swings and irritability at least once a week. R. at 44. She estimates she could stand for twenty to thirty minutes; any longer makes her back hurt and "just wears [her] out." R. at 46. She can sit for only thirty minutes before she gets uncomfortable and has to move. R. at 47.

A vocational expert ("VE") testified Plaintiff's prior work ranged between unskilled and semiskilled. All of her prior work had exertional levels between medium and heavy, but she performed them at the light level of exertion. R. at 54. The VE was then asked a hypothetical question assuming a person of Plaintiff's work history capable of sitting for up to two hours before having to change position, stand for up to forty-five minutes, lift less than ten pounds frequently and ten pounds occasionally, could only occasionally bend, crouch, stoop or climb stairs, with moderate to marked limitations in her ability to remember and follow detailed instructions and slight limitations in her ability to respond to pressure and interact with others. He testified such a person could perform sedentary work including general assembler and table worker. R. at 54-55. If such an individual also needed to rest for three hours in an eight hour day, the individual could not perform work in the national economy. R. at 55. The VE also testified the individual could not perform work if she lacked the use of her left arm for three to four days per month. R. at 57.

The ALJ noted neither Dr. Wiggins nor Dr. Qualls indicated Plaintiff's abilities were as limited as she testified. Moreover, there was no evidence Plaintiff told her doctors about the ailments or the extent of the ailments she described in her testimony. The few references to exertional or functional abilities indicated Plaintiff should exercise and be active, which is inconsistent with her testimony. With respect to Plaintiff's depression, the ALJ noted Plaintiff had not sought further treatment or indicated to Dr. Qualls the Lexapro he prescribed was ineffective. The ALJ ultimately found Plaintiff to be limited in a manner consistent with Dr. Qualls' Cardiac RFC and, based on the VE's testimony, found Plaintiff could perform work in the national economy.

Plaintiff appealed to the Appeals Council. On April 13, 2006, Plaintiff submitted a Physical Residual Functional Capacity Assessment Form ("Physical RFC") prepared by Dr. J. Bentley. R. at 370. The Physical RFC is dated September 15, 2005, which was

4

approximately two months after the ALJ rendered his decision. Dr. Bentley's Physical RFC indicates Plaintiff can sit a total of six hours per day, stand for five hours per day, walk for four hours per day, and work for four hours per day. He indicates Plaintiff suffers from mild to moderate dyspnea upon exertion and mild pain. No test results are provided, no basis for knowledge is provided, and no narrative of importance is provided. R. at 371-75. The Appeals Council denied Plaintiff's request for review. R. at 7-10.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

### A. Plaintiff's Subjective Complaints

Plaintiff contends the ALJ erred in failing to give appropriate weight to her subjective complaints. The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

5

> While the claimant has the burden of proving that the
> disability results from a medically determinable physical or
> mental impairment, direct medical evidence of the cause and
> effect relationship between the impairment and the degree of
> claimant's subjective complaints need not be produced. The
> adjudicator may not disregard a claimant's subjective
> complaints solely because the objective medical evidence
> does not fully support them.
>
> The absence of an objective medical basis which supports
> the degree of severity of subjective complaints alleged is just
> one factor to be considered in evaluating the credibility of the
> testimony and complaints. The adjudicator must give full
> consideration to all of the evidence presented relating to
> subjective complaints, including the claimant's prior work
> record, and observations by third parties and treating and
> examining physicians relating to such matters as:
>
>   1. The claimant's daily activities;
>   2. the duration, frequency and intensity of the pain
>   3. precipitating and aggravating factors;
>   4. dosage, effectiveness and side effects of
>   medication;
>   5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's
> subjective complaints solely on the basis of personal
> observations. Subjective complaints may be discounted if
> there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

Plaintiff's subjective complaints cannot be discounted or ignored simply because they are not fully corroborated by objective medical evidence. However, Plaintiff's testimony is contradicted by evidence in the record. She testified to experiencing serious physical problems, yet never reported them (or, at least, their seriousness) to her doctors. Compounding this failure is a strong motivation to accurately report all heart and breathing problems in light of her surgeries and pacemaker. Neither Dr. Wiggins nor Dr. Qualls suggested Plaintiff is limited or cannot work. Dr. Qualls expressed his belief Plaintiff was not malingering, but he did not hear the same complaints she advanced during the hearing. Dr. Bentley's Physical RFC does not

6

support Plaintiff because Dr. Bentley did not purport to perform any testing to support his conclusions or otherwise explain how he arrived at them. With respect to her depression, Plaintiff was treated rather conservatively and did not seek further treatment – belying her claim that the medication was not fully effective. Plaintiff prepared a statement in October 2003 indicating a willingness and desire to return to work. R. at 146. This statement contradicts her claim that she became disabled in July of 2003. Finally, the ALJ considered Plaintiff's daily activities, which were not consistent with her claims. R. at 166-68. Substantial evidence supports the ALJ's determination Plaintiff's testimony was not fully credible.

## B. Availability of Work

Plaintiff presents two arguments. First, she argues the jobs the VE testified Plaintiff could perform are the same jobs she used to have. The ALJ determined Plaintiff could not return to her past work, so she must not be able to perform the jobs the VE described. First, these are not exactly the jobs Plaintiff performed. Second, jobs can be performed at various exertional levels and the ALJ was entitled to accept the VE's testimony that these jobs could be performed at the sedentary level. This is particularly significant, given the VE's testimony Plaintiff performed her prior work at or above the light level of exertion.

Plaintiff's second argument contends work opportunities do not really exist because employers will not hire (or insure) a person with a pacemaker. This argument is both speculative and irrelevant. The Commissioner need not identify a particular employer willing to hire the claimant; it is enough that jobs exist the claimant can perform. Kerns v. Apfel, 160 F.3d 464, 467-68 & n.10 (8th Cir. 1998) (citing 20 C.F.R. § 404.1566(c)); see also 20 C.F.R. § 416.966.

7

### C. Failure to Consider Combined Effect of All Impairments

In her third contention Plaintiff argues the ALJ failed to consider the combined effect of her impairments. To the contrary, the ALJ's findings and the hypothetical he posed to the VE considered all of Plaintiff's impairments that he found were credible.

### D. Failure to Defer to Treating Physicians

Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). The problem with Plaintiff's argument is the ALJ's findings are practically the same as Dr. Qualls' Cardiac RFC. Similarly, the hypothetical question posed to the VE incorporated practically all the limitations contained in the Cardiac RFC. Plaintiff also fails to specifically identify any opinion of a treating physician that was rejected.

Plaintiff does not specifically refer to Dr. Bentley' Physical RFC in this section, but the Court observes the absence of any indication that Dr. Bentley was a treating physician. Even if he was, the absence of any clinical data or explanation for his conclusions would justify the ALJ's decision not to defer to the Physical RFC.

Plaintiff also alleges the ALJ accorded undue weight to the consulting opinion of Dr. Judy Robbins. As stated, the ALJ's findings were consistent with Dr. Qualls' opinions, so this contention does not ring true. In fact, while the ALJ indicated he was "inclined to give significant weight to the state agency physicians since they are considered 'experts' under the Regulations," he did not do so because they "did not have the benefit of evidence admitted after their review and the pertinent testimony at the hearing." R. at 23.

## III. CONCLUSION

The Commissioner's decision is supported by substantial evidence in the record as a whole, so his decision denying benefits is affirmed.

IT IS SO ORDERED.

                                             /s/ Ortrie D. Smith
                                             ORTRIE D. SMITH, JUDGE
DATE: October 4, 2007                UNITED STATES DISTRICT COURT